UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAMIEN NEITA,

                      Plaintiff,

                -against-

PRECISION PIPELINE SOLUTIONS,
RANDY SOOHOO, and JASON GONG,

                    Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV 15-649 (JS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.      PRELIMINARY STATEMENT**

     *Pro se* Plaintiff Damien Neita ("Plaintiff") brings this employment discrimination action against his former employer Precision Pipeline Solutions ("PPS") and supervisors Randy Soohoo ("Soohoo") and Jason Gong ("Gong") (collectively, "Defendants") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq. See generally* Plaintiff's Complaint ("Compl.") [DE 1]. Plaintiff was an employee of PPS, a company specializing in pipeline infrastructure, as a natural gas meter "reader" and "installer" at various locations in Long Island, New York. According to the Plaintiff, Defendants engaged in multiple acts of discrimination against him based on his race. *See* Compl. at 3. Both Plaintiff and Defendants have now filed separate motions for summary judgment. *See* DE 58, 61. Judge Seybert referred both motions to this Court for a Report and Recommendation as to whether the motions should be granted "and, if necessary, to determine the appropriate amount of damages, costs and/or fees to be awarded." *See* DE 93, 96. For the reasons which follow, the Court respectfully recommends to Judge

Seybert that Plaintiff's motion for summary judgment be DENIED, and that Defendants' motion for summary judgment be GRANTED.

## II.    BACKGROUND

### A.  Procedural History

Given the somewhat complex procedural history of this case and the number of filings related to the instant motions for summary judgment, the Court begins with a review of the procedural history to date.  At the outset, the Court points out that several of the filings are either duplicative, untimely, or deficient, as explained in further detail below.

### 1.  *Administrative Prelude*

On or about April 23, 2014, Plaintiff filed an administrative complaint with the New York State Division of Human Rights ("NYSDHR") alleging that Defendants engaged in several acts of discrimination against him based on the fact that he is African-American.  Specifically, Plaintiff claimed that the Defendants harassed/intimidated him, denied him a promotion or pay raise, assigned him different or worse job duties than other workers with Plaintiff's same title, and forced Plaintiff to resign.  *See* Compl. at 22;[1] Affirmation of David S. Greenhouse in Support of Defendants' Motion for Summary Judgment ("Greenhouse Aff.") [DE 59], Ex. 1 [DE 59-1].  In the written narrative submitted with the NYSDHR complaint, Plaintiff states:

---

[1]     Plaintiff's pleading as filed with this Court is a compilation of documents, totaling 71 pages, beginning with his *pro se* form Complaint.  DE 1.  The form Complaint advises *pro se* plaintiffs that they may attach copies of any charge or complaint filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.  Plaintiff Neita attached all such filings he made to these administrative agencies, as well as his November 12, 2014 "Dismissal and Notice of Rights" from the Equal Employment Opportunity Commission.  The 71 pages of the "Complaint" are not individually numbered.  For ease of reference, the Court will utilize the pages numbers assigned by the ECF filing system which appear at the top of each page.

> I believe I was discriminated against on the basis of my race/color when my company engaged in a campaign of harassment and intimidation designed to force me to resign or get fired. I formed this opinion when my company transferred [me] from Ronkonkoma to Hicksville and I discovered they were motivated by race to meet a quota. I was assigned to neighborhoods where the work was harder. The company began counseling about read percentages, when my percentage was high they transferred me to areas where my percentage was low. And white employees [ ] were given routes with high read percentages. A supervisor required me to wash the company car at my own expense and did not require white employees to do the same.

Compl. at 24; Greenhouse Aff., Ex. 1.

On or about June 11, 2014, PPS submitted a nine-page position statement in response to Plaintiff's NYSDHR complaint. *See* Compl. at 34-42; Greenhouse Aff., Ex. 3. Several weeks later, on or about June 25, 2014, Plaintiff submitted a rebuttal narrative in response to PPS's position statement. *See* Compl. at 54-66; Greenhouse Aff., Ex. 3. On September 24, 2014, DRH issued a Determination and Order After Investigation in which it found no probable cause to believe PPS engaged in unlawful discrimination. *See* Compl. at 67-68; Greenhouse Aff., Ex. 3. Thereafter, Plaintiff appealed NYSDHR's determination to the United States Equal Employment Opportunity Commission ("EEOC"). *See* Compl. at 70; Greenhouse Aff., Ex. 3. On November 12, 2014, the EEOC issued a Dismissal and Notice of Right to Sue Letter. *See* Compl. at 71; Greenhouse Aff., Ex. 3.

### 2. *The Instant Action*

Plaintiff commenced this action with the filing of a form discrimination complaint on February 6, 2015. *See generally* Compl. In his Complaint, Plaintiff alleges that Defendants failed to promote him, provided him unequal terms and conditions of employment, retaliated against him, and maintained a "quota system." Compl. at 3. Incorporated as part of his

3

Complaint, Plaintiff submitted an eight-page addendum narrative, in which he alleges multiple

acts of discrimination by PPS and its personnel.  The allegations contained in Plaintiff's

addendum provide the context for both Plaintiff and Defendants' summary judgment motions.

### a.  Plaintiff's Complaint

Plaintiff began working for PPS on "September 11 [2013] as [ ] AMR/ERT tech in the

Riverhead Office.  (We all started at that office until the Ronkonkoma office opened in late

October)."  Compl. at 8.  Around that time, Plaintiff felt he was being groomed for a "team

leader" position along with six other employees; however, "[a] month later only one of us was

promoted to team leader, (Joey who is Native American and Hispanic) and was giv[en] new

responsibilities."  *Id.*  Plaintiff states that "[a]bout three weeks later they brought in another

Hispanic male to be team leader. He later told me that [he] was [a] supervisor / field manager for

cablevision."  *Id.*  In the weeks that followed, Plaintiff was assigned one more co-workers to

work with, which he felt increased his responsibilities.  *Id.*  He also "felt the way th[ey] divided

up the work was not fair," in that he was not getting routes with optimal outside-to-inside gas

meters, which made his job more difficult.  *Id.*  "My routes were generally 50/50 or 60/40

outside to inside.  Some employees had 80/20 or better."  *Id.*  Plaintiff describes two incidents

where he felt he was treated unfairly -- one where he felt a new route he was assigned was

unfairly difficult, and one where he volunteered to do "meter reading," but then changed his

mind, and because of this he "became concern[ed] that [a supervisor] will [*sic*] become hostile

towards me."  *Id*. at 8-9.

Plaintiff states that around December 2, 2013, he was informed that he was being

transferred from the Ronkonkoma office to the Hicksville office "which is about 35 minutes

from [Plaintiff's] house" while the Ronkonkoma office was only 10 minutes from his house. *See id*. at 9.  Plaintiff was informed that every employee was assigned the office closest to their place of residence, and "[s]ince most people live[d] close[st] to Ronkonkoma, once it was filled, they were then moved to the next closest location which was Hicksville." *Id*.  When Plaintiff asked if he could be transferred back to Ronkonkoma, he was told he could not be transferred immediately, but that he was first on the list once a spot opened up. *See id*.  At that time, Plaintiff says he learned there were new team leaders for each office.  An Hispanic male was the new team leader for the Hicksville office, a black woman was the new team leader for Ronkonkoma, another black woman was the team leader at the Oceanside office, and a white male was the team leader at the Riverhead office. *See id*.  Plaintiff claims the white male had no prior experience but took a team leader test, while Plaintiff "had no knowledge of the test and was never given an opportunity to take the test." *Id*.

Around this time, Plaintiff learned that an Hispanic male employee volunteered to move from Ronkonkoma to Hicksville. *See id.*  Upon hearing this, Plaintiff asked if he could be transferred, presumably to take the position of the employee who had volunteered to move. *Id*. at 9-10.  Plaintiff alleges a supervisor overheard his request. *Id*. at 10.

For the first few days of his time at the Hicksville location, Plaintiff states he was the only African-American there and that there was only one Hispanic employee and one female employee at the location. *Id*.  Plaintiff contends that because he "live[d] in Central Islip and was 10 minutes from Ronkonkoma" and because the Hispanic and female employee lived near him, he "felt [they] were transferred to the Hicksville office to fill a quota." *Id*.

During his time reading gas meters in Hicksville, Plaintiff states he was initially assigned to routes where the gas meters were outside and he was able to read 80% to 90% of the meters on the routes. *Id.* Subsequently, he was moved to a route where he was only able to read 50% of the meters, and instead of getting "one full route for the day, [he] would be given several partial routes." *Id.* According to the Complaint, Plaintiff says that he had obtained documents from National Grid, the company which had contracted with PPS for the project that required Plaintiff to transfer to Hicksville, showing that PPS was not properly evaluating its meter readers. *Id.* Specifically, PPS would evaluate meter readers based on the amount of actual meters read, rather than on meeting a range of number of meters read per day for a given neighborhood. *Id.* Because of this procedure, Plaintiff states that during morning meetings, PPS would tell its employees they "needed to get the read percentage up," and Plaintiff was asked on several occasions by management to come in on the weekends or stay late to bring up the percentage. *Id.* Plaintiff states "I was paid for all my overtime hours but [PPS] gave the impression that if we and or I did not work extra hours we would be in danger of losing our jobs." *Id.*

While in Hicksville, Plaintiff and other meter readers "had to be back at the yard by 3:15 so that the data can be uploaded by 3:30 if we had a critical cycle (the last day that a route could be done/read)." *Id.* On a day where Plaintiff had a "critical route,[2]" he states he was unable to get back to the yard until 4:35 p.m., and when he was called at 3:50, and 4:28, he was screamed at and told to get back as soon as possible. At one point, he was told he might not get paid for the day. *Id.* at 11. However, Plaintiff states that he was ultimately paid for the day, and a supervisor told him "it was just one day and not to worry about it. . . . The next morning [a

---

[2]  The Court interprets Plaintiff's use of "cycle" and "route" to be synonymous.

supervisor] told [Plaintiff] that . . . [he] looked really sad and someone should talk to [him]. And then [two supervisors] decided to go out and speak with [him]." *Id*.

Additionally, while at Hicksville, Plaintiff claims Glen, a white male, came down from upstate to perform quality assurance for PPS. *Id*. Plaintiff claims he was "randomly selected" to be observed in four consecutive weeks, which Plaintiff apparently found suspicious since "[t]here w[ere] about 30 meter readers in the office." *Id*.

In early January 2014, Plaintiff began asking about a transfer back to Ronkonkoma. *Id*. at 12. He was initially told that PPS was looking into it. Plaintiff asked again two weeks later, at which time he was told "they are working on it and there is a training class that would start in two weeks; [he] would be able to transfer then." *Id*. Two and a half weeks later, Plaintiff had not heard anything and asked again, at which time he was told "there have been emails going around about it." *Id*. Finally, at the beginning of March 2014, Plaintiff was told the transfer "had been taken care of" and Plaintiff could likely start in Ronkonkoma the following week. *Id*. Plaintiff states that "[a]t the start of the [following] week, I was still [at the Hicksville location]." *Id*.

At some point in this timeframe, Plaintiff asserts that one of his supervisors, John Parente, asked him about his thoughts regarding the best way to wash cars. *Id*. During this conversation, Parente "started to insinuate that the employees would be washing the [company] car[s]," and his supervisor stated that PPS would not pay for the company cars to be taken to the car wash. *Id*. Plaintiff subsequently called Human Resources to file a complaint regarding (1) his inability to get a transfer to Ronkonkoma, (2) the conversation with John Parente regarding the washing of the company cars, and (3) Plaintiff's feeling that John Parente would "waste

7

[Plaintiff's] time by just talking about random things" while Plaintiff waited to be clocked out. *Id.* Plaintiff felt that "because [Plaintiff] was ignoring [John Parente, Mr. Parente] tried to escalate the situation by telling [Plaintiff] to wash the car." *Id.*

Although the chronology is not clear from Plaintiff's addendum, Plaintiff states he was subsequently told that he and several other employees were being transferred back to Ronkonkoma. *Id.* at 13. However, Plaintiff was informed that he was being sent back to Ronkonkoma to do meter installation, not meter reading, despite the fact Plaintiff "did not want to [do] installations (of AMR/ERT) and instead wanted to be transfer[ed] to Ronkonkoma to do meter reading." *Id.* Upon his transfer to Ronkonkoma, Plaintiff discovered he was only one of two African-American males doing installation. *Id.* Plaintiff states "I think they moved us back to fill their quota at this location." *Id.*

While working back at Ronkonkoma, Plaintiff alleges he was unfairly criticized for low numbers of meter installations. *Id.* at 13-14. Thereafter, Plaintiff informed PPS that he was giving his two weeks notice, and when asked if there was any particular reason he was leaving, Plaintiff stated as follows: "I just said that I don't like the job anymore." *Id.* at 14. During his final two weeks, Plaintiff claims he received a company car so that he could drive one of his routes, and the car "was very dirty, the dashboard and the center console had stuck on dirt and all four door panels where [*sic*] covered with what appears to be drops of dried up snow. There was a dirty sweater, dirty safety vest as well as several dirty safety gloves." *Id.* In addition, during his last few weeks, Plaintiff alleges he was unfairly reprimanded for improperly parking his company car at the company yard. *Id.* at 14-15.

### b.  Filings With Respect to the Instant Motions

Given the nature of summary judgment motion practice in this case, a review of the relevant docket entries as they relate to the parties' motions is necessary.

### i.  Introductory Filings

This Court first became aware of the parties' intent to commence summary judgment motion practice at a status conference on January 26, 2016.  At that time, the parties were instructed to proceed with summary judgment motion practice in accordance with Judge Seybert's Individual Rules.  *See* DE 24.  Several months later, on May 2, 2016, Defendants' counsel informed the Court that Plaintiff advised he intended to serve his motion for summary judgment in the immediate future.  *See* DE 29.  As a result, the Court scheduled a status conference and stated that "neither party is to serve their Rule 56.1 Statement between the date of this Order [May 3, 2016] and the conference date [May 11, 2016]."  DE 30.  At the May 11, 2016 conference, the Court set a schedule for Defendants' and Plaintiff's anticipated motions. *See* DE 32.  Pursuant to that schedule, Defendants were to serve their Rule 56.1 Statement of Undisputed Facts by June 14, 2016; Plaintiff was to serve his Rule 56.1 Counterstatement by July 6, 2016; Plaintiff was to serve his Rule 56.1 Statement by July 29, 2016; and Defendants were to serve their Rule 56.1 Counterstatement by August 22, 2016.  *See id.*  Following the Court's granting Defendants' motion to extend the deadlines set in the schedule by several days, *see* DE 34; Electronic Order of June 10, 2016, Plaintiff filed a Rule 56.1 Counterstatement on ECF on July 18, 2016, *see* DE 37, and a Rule 56.1 Statement on August 1, 2016.  *See* DE 38. Defendants then filed a Rule 56.1 Counterstatement on August 22, 2016.  *See* DE 39.

### ii.  Request for Pre-Motion Conference

On September 6, 2016, the parties filed a joint letter to Judge Seybert requesting a conference to seek permission to engage in summary judgment motion practice.  DE 40.  Judge Seybert scheduled a conference for October 28, 2016 that was subsequently rescheduled to December 2, 2016.  *See* DE 41, 44.  Between the filing of the request for a pre-motion conference and the scheduling of that conference, Plaintiff filed two applications, one requesting an extension of time to submit an amended Rule 56.1 Statement – which this Court granted, giving Plaintiff until November 21, 2016 to submit an amended Rule 56.1 Statement – and one purporting to submit a revised Rule 56.1 Counterstatement.  *See* DE 42, 43; Electronic Order of October 4, 2016.  Plaintiff filed a revised Rule 56.1 Statement and an "Affidavit in Support of Motion for Summary Judgment" on ECF on November 29, 2016, along with correspondence explaining that the document was "tard[y]" because Plaintiff had "noted the due date as the 28th, instead of the 21st."  DE 47; *see* DE 48, 49.

On December 2, 2016, the parties appeared before Judge Seybert for the pre-motion conference, at which time several deadlines regarding motion practice were set:  Defendants' counsel was directed to submit a revised Rule 56.1 Statement by January 6, 2017 and Plaintiff was directed to respond by January 20, 2017.  *See* DE 51.  Further, Judge Seybert instructed the parties to file their motions for summary judgment by February 10, 2017, opposition papers by March 10, and replies by March 20, 2017.  *See id.*  Thereafter, on December 22, 2016, Defendants filed a Rule 56.1 Counterstatement to Plaintiff's Amended Rule 56.1 Statement.  *See* DE 52. On January 6, 2017 Defendants filed an Amended Rule 56.1 Statement.  *See* DE 53. Plaintiff filed a "Response to Defendants' Counter-Statement of Facts pursuant to Rule 56.1" on

January 20, 2017.  DE 54.  That same day, Plaintiff filed a letter motion requesting leave to file an Amended Rule 56.1 Counterstatement to Defendants' Amended Rule 56.1 Statement, *see* DE 55, which Judge Seybert granted.  *See* Electronic Order of January 26, 2017.  On January 26, 2017, Plaintiff submitted an Amended Rule 56.1 Counterstatement.  *See* DE 56.  Defendants moved for an extension of time to file their motion for summary judgment on February 6, 2017. DE 57.  Judge Seybert granted that motion and set new filing deadlines as follows: summary judgment motions due February 17, 2017; opposition papers due March 17, 2017; and replies due March 27, 2017.  *See* Electronic Order of February 7, 2017.

### iii.  Filing of Motions

On February 17, 2017, Defendants filed their motion for summary judgment, affidavit/declaration in support, and memorandum of law.  *See* DE 58-60.  That same day, Plaintiff submitted a filing entitled "Letter Motion for Summary Judgment from Damien Neita to Judge Seybert dated 2/17/2017 Re: To submit documents to address claims made at Court conference and in response to Court questions regarding promotions and job requirements."  DE 61.  This filing contained four primary documents and 343 pages of attachments.  *See id*.  The primary documents are titled "Motion For Summary Judgment: Hostile Work Environment," "Motion for Summary Judgment: Response that I Did Not Properly Answer Questions," "Motion For Summary Judgment: Less Qualified Employees That Were Promoted Ahead Of Me," and "Motion for Summary Judgment: Missing And/Or Conflicting Information Submitted By Defendant."  *Id*.  The filing is introduced by a letter to Judge Seybert explaining that "[d]uring our conference, the defendant made arguments regarding: 'hostile work environment', I did not fully answer his questions . . . . Thus I am submitting documents to address those claims."  *Id*.  In

11

his letter, Plaintiff also stated "I would like to retract the document entitled Daily Billing Sheets that I submitted with my Rule 56.1, and replace it with Amended Daily Billing Sheets." *Id.*

On March 17, 2017 Defendants filed their memorandum in opposition to Plaintiff's motion. *See* DE 62. Plaintiff filed what appears to be his opposition to Defendants' motion for summary judgment on March 20, 2017. *See* DE 63. Defendants filed their reply to Plaintiff's opposition on March 27, 2017. *See* DE 64.

### iv.  Supplemental Filings

On April 3, 2017, Plaintiff filed a letter directed to this Court stating "I have submitted two documents regarding matters of discovery. Once a ruling is made, I will amend my 56.1 with those findings. The defendant has raised two objections to my rule 56.1 filings . . . . I will like to . . . review the filings, as [*sic*] will seek the help of the courthouse and correct these issues by 4/7/17. If I have trouble refiling the rule 56.1, I will let you know." DE 68. Thereafter, on April 7, 2017, Plaintiff filed three documents. The first is a letter explaining that Plaintiff "would like to retract Plaintiff Rule 56.1 filed 8/8/2016 (docket entry 38), as well as Plaintiff Revised 56.1(b) filed 11/29/16 (docket entry 48), and replace it with Plaintiff Rule 56.1 that is attached." DE 72. Plaintiff goes on to state

> I filed Plaintiff Rule 56.1; the defendant filed a counter statement and then I filed a response to that counterstatement on 1/26/17. That document was titled; Plaintiff's (Amended) Response to Defendant's Counter-Statement of Facts Pursuant to Rule 56.1. But instead should have been titled, Plaintiff's Response to Defendant's Counter-Statement of Facts to Plaintiff's Revised Statement Pursuant to Rule 56.1
>
> The appropriate title has been placed onto that document and re-filed. Therefore I will like to retract docket entry 56 and replace it with the new counter statement attached to this document. These steps should remedy the filing errors.

12

*Id.* The second and third documents filed on April 7, 2017 are titled "Rule 56.1 Statement" and "Response to Defendant's Rule 56.1 Counter-Statement," respectively. *See* DE 73, 74.

On April 17, 2017, Defendants' counsel submitted an "Affirmation of David S. Greenhaus in Opposition to Plaintiff's Post-Summary Judgment Submissions," opposing the supplemental submissions which were filed on April 7, 2017. *See* DE 76.

Judge Seybert referred Defendant's motion for summary judgment to this Court on October 12, 2017, and issued a revised referral Order on December 29, 2017, superseding the first referral and, in addition to Defendants' motion for summary judgment, referring Plaintiff's letter motion for summary judgment "to the extent it can be construed as such." DE 96.

### B. Threshold Inquiries: The Record on Summary Judgment

#### 1. *Which Filings to Consider*

##### a. Untimely Filings

Before the Court can review the facts propounded in the parties' Rule 56.1 Statements and whether there exist any genuine disputes with respect to those facts, the Court must determine which of the myriad summary judgment filings are appropriate to consider. Initially, the Court observes that the amended briefing schedule contained in Judge Seybert's Electronic Order of February 7, 2017 sets the final deadlines for submission of filings with respect to the parties' motions. That Order required motions to be filed by February 17, 2017, opposition briefs to be filed by March 17, 2017, and replies to be filed by March 27, 2017. *See* Electronic Order of February 7, 2017. Several of Plaintiff's filings are well beyond these deadlines, specifically the April 7, 2017, filings which purport to be an Amended Rule 56.1 Statement and "Response to Defendant's Rule 56.1 Counter-Statement." *See* DE 73, 74.

13

"A court can consider an untimely filing if good cause is shown for the delay."

*Willingham v. Sw. Airlines*, No. 1:15-CV-1511, 2016 WL 3747931, at *2 n.5 (N.D.N.Y. July 11,

2016).  In order to meet the "good cause" standard a party must show, at a minimum, "that the

deadlines cannot reasonably be met despite the diligence of the party needing the extension."

*Corkrey v. Internal Revenue Serv.*, 192 F.R.D. 66, 67 (N.D.N.Y. 2000) (internal quotations and

citation omitted); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)

(explaining that a "finding of 'good cause' depends on the diligence of the moving party");

*Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 244 (2d Cir. 2007) ("[T]he primary

consideration is whether the moving party can demonstrate diligence."); *Holland v. Goord*, No.

05 CV 6295, 2010 WL 3946297, at *3 (W.D.N.Y. Aug. 17, 2010), *report and recommendation*

*adopted*, No. 05 CV 6295, 2010 WL 3946292 (W.D.N.Y. Oct. 8, 2010).  Significantly, mere

neglect, carelessness, or oversight is insufficient to the meet the "good cause" standard.  *See*

*Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 CIV 4635, 2005 WL 1138470, at *2

(S.D.N.Y. May 12, 2005); *Lamothe v. Town of Oyster Bay*, No. 08-CV-2078, 2011 WL 4974804,

at *7 (E.D.N.Y. Oct. 19, 2011); *Bracy v. State of New York, et al.*, No. 98 CV 3308, 2001 WL

1550666, at *1 (S.D.N.Y. Nov. 28, 2001).

Local Rule 56.1 does not contemplate a "response" to a Rule 56.1 Counterstatement.  *See*

Loc. Civ. R. 56.1.  On April 7, 2017, after the summary judgment motions had been fully briefed

and filed, Plaintiff submitted a document entitled "Plaintiff's Response to Defendant's Counter-

Statement of Facts to Plaintiff's Revised Statement Pursuant to Rule 56.1."  DE 74.  Plaintiff did

not ask for or obtain permission from Judge Seybert to make this submission.  That document

starts off by asking that "the court [] please provide a clear definition of the term 'hearsay, I

14

request a thorough explanation. *Id.* ¶ 1. The April 7, 2017 submission cannot properly be considered here both because Plaintiff has failed to make a showing of "good cause" for its untimeliness and because there is no legal authority which permits a court to accept a response to another party's Counterstatement. No litigant is free to submit papers of any nature at any time during a litigation. That is why the Court has Rules which litigants must observe and the Court must enforce. In particular, a plaintiff is not entitled to file motion papers at his/her leisure nor to constantly attempt to replace old filings with new ones. *See id.*; *see also* DE 50, 54-56. "Plaintiff's status as a *pro se* litigant does not relieve [him] of [his] obligation to adhere to all applicable procedural rules." *Guity v. Uniondale Union Free Sch. Dist.*, No. 15-CV-5693, 2017 WL 1233846, at *3 (E.D.N.Y. Mar. 31, 2017); *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) ("[P]*ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") (internal quotations and citations omitted). Consequently, the Court declines to consider DE 72 -74 in the instant analysis.

### b.  Summary of Relevant Filings

The motion papers filed in accordance with Judge Seybert's briefing schedule, and the papers which this Court considers in deciding the parties' motions are as follows with respect to Plaintiff:  Plaintiff's (Amended) Rule 56.1 Statement[3] [DE 48]; Plaintiff's affidavit in support of his motion for summary judgment [DE 49]; Plaintiff's Rule 56.1 Counterstatement [DE 56]; Plaintiff's motion for summary judgment [DE 61]; and Plaintiff's opposition to Defendants'

---

[3]  The Court points out that this filing was technically untimely, since it was to be served on Defendants by November 21, 2016.  However, the document was filed (and presumably served) on November 29, 2016.  *See* Electronic Order of October 4, 2016.  In addition, as noted in footnote 4, *supra*, neither party should have been filing a Rule 56.1 Statement prior to the request for a pre-motion conference before Judge Seybert.  Albeit reluctantly, in an abundance of caution, the Court considers Plaintiff's Amended Rule 56.1 Statement.

motion for summary judgment [DE 63].  With respect to Defendants' moving papers, the Court

considers the following:  Defendants' (Amended) Rule 56.1 Statement [DE 53]; Defendants'

Rule 56.1 Counterstatement [DE 52]; Defendants' motion for summary judgment [DE 58];

Defendants' affidavit in support [DE 59]; Defendants' memorandum in support [DE 60];

Defendants' memorandum in opposition to Plaintiff's motion for summary judgment [DE 62];

and Defendants' reply [DE 64].

### 2.    *Plaintiff's Failure to Comport his Motion Papers with Rule 56.1*

While the Court considers the above papers in its analysis of the parties' motions, the

Court does not waive its duty to examine and reject any portion of the papers which fails to

comport with all applicable procedural directives and evidentiary standards.  In addition to the

procedural rules, the parties are required to comply with Judge Seybert's Individual Rules.  *See*

Individual Rules of the Hon. Joanna Seybert at (IV)(F)(2) ("Adherence to Local Civil Rule 56.1

is required. . . . All parties are directed to review Local Rule 56.1 carefully.  Statements

submitted to the Court that are not in strict compliance with Local Rule 56.1 *shall be rejected*.")

(emphasis added).

In this regard, the Court is compelled to note at the outset several critical deficiencies

from which Plaintiff's motion papers suffer with respect to Rule 56.1 compliance.  Plaintiff's

Rule 56.1 Counterstatement [DE 56] begins at paragraph (6) and not only omits corresponding

paragraphs to paragraphs (1) through (5) of Defendants' Rule 56.1 Statement, but wholly omits

responses to many other paragraphs as well.  These omissions contravene Local Rule 56.1(b),

which requires that "[t]he papers opposing a motion for summary judgment shall include a

corresponding paragraph responding *to each numbered paragraph* in the statement of the

moving party." Loc. Civ. R. 56.1(b) (emphasis added). Similarly, Plaintiff's Counterstatement fails to comply with Loc. Civ. R. 56.1(d) because when plaintiff actually does purport to respond to facts asserted by the Defendants, he has failed to cite to specific evidence in the underlying record which supports his arguments. *See* Loc. Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff either fails to respond to a fact asserted by Defendants, or responds without citing to the record, the Court will deem the fact admitted. *See* Loc. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party [ ] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

Plaintiff's Rule 56.1 Statement of Undisputed Fact suffers from the same deficiencies as Plaintiff's Counterstatement in that many of the asserted facts are unsupported by citations to evidence in the underlying record. The Court also declines to consider such assertions in the Plaintiff's Statement of Undisputed Facts.[4] *See* Loc. Civ. R. 56.1(c)-(d).

Additionally, both Plaintiff's Rule 56.1 Statement and Counterstatement improperly assert legal arguments and conclusions. The Court declines to credit or consider improper argument or conclusory assertions in Plaintiff's Rule 56.1 filings. *See Hengjin Sun v. China*

---

[4] Along with their motion papers, Defendants served Plaintiff with the proper Notice to Pro Se Litigants required by Local Civil Rule 56.2. *See* DE 58.

*1221, Inc.*, No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015) (finding legal

argument in plaintiff's Rule 56.1 counter-statement improper and disregarding statements

including improper argument); *Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at *1

(S.D.N.Y. May 7, 2015), *aff'd sub nom. Watson v. Sims*, 648 F. App'x 49 (2d Cir. 2016) (finding

conclusory and/or argumentative allegations in 56.1 statement improper and declining to

consider the same).

### 2.   *Evidentiary Deficiencies*

Another issue which must be addressed before the Court can consider the existence or

nonexistence of undisputed material facts is the form of the evidence Plaintiff cites in support of

his motion.  "The principles governing admissibility of evidence do not change on a motion for

summary judgment."  *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244,

264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-55 (2d Cir. 1997)).

Specifically, "Rule 56(e) provides that affidavits in support of and against summary judgment

shall set forth such facts as would be *admissible in evidence.* Therefore, only admissible

evidence need be considered by the trial court in ruling on a motion for summary judgment."

*Presbyterian Church Of Sudan*, 582 F.3d at 264 (quoting *Raskin*, 125 F.3d at 66)) (emphasis in

original).  "Because the purpose of summary judgment is to weed out cases in which there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law, it is appropriate for district courts to decide questions regarding the admissibility

of evidence on summary judgment."  *Presbyterian Church Of Sudan*, 582 F.3d at 264 (internal

quotations omitted); *see Ravenell v. Avis Budget Grp., Inc*., No. 08-CV-2113, 2014 WL

1330914, at *1 (E.D.N.Y. Mar. 31, 2014) ("A district court deciding a summary judgment

18

motion 'has broad discretion in choosing whether to admit evidence.'") (quoting *Raskin*, 125 F.3d at 65-55).

The Court observes that where Plaintiff attempts to support his factual assertions by a citation to the underlying record, the reference he makes is by and large either partially or exclusively from his own affidavit [DE 49].  Indeed, by the Court's count, 37 of the 50 paragraphs in Plaintiff's Rule 56.1 Statement are supported in whole or in part by a citation to Plaintiff's affidavit.  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see* Fed. R. Evid. 602.  The Court has thoroughly examined Plaintiff's affidavit and finds that the vast majority of the statements made in it fail on one or more of these requirements.  On the whole, the affidavit is comprised of Plaintiff's unsupported speculation regarding a number of topics, myriad hearsay statements, conclusory assertions, and legal argument.  The affidavit fails to establish the basis for Plaintiff's personal knowledge regarding any of the issues attested to.  Giving the *pro se* Plaintiff's filing every benefit of the doubt, the Court has distilled from the affidavit's 37 paragraphs only a handful of statements which could arguably have been made "on personal knowledge [which] set out facts that would be admissible in evidence, and [that] show the [Plaintiff] is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  The Court does not consider or credit facts asserted which substantially rely on those portions of Plaintiff's affidavit which fail to satisfy this standard.[5]

---

[5]   Additionally, the Court notes that Plaintiff has submitted with his motion papers approximately 345 pages of attachments, approximately 230 of which are titled "Daily Billing

### C.  Factual Background

The two Rule 56.1 Statements of Undisputed Fact submitted by the parties are irreconcilable.  Because of this, the Court presents the facts as asserted by each party independently.

#### 1.  *Undisputed Facts as Asserted by Defendants*

The following facts are drawn from Defendants' Rule 56.1 Statement [DE 53].  The Court references the Rule 56.1 Statement rather than the underlying record and the facts asserted are undisputed unless otherwise noted.  The Court summarizes only those facts and responses which are properly asserted – *i.e.*, which are supported by a citation to admissible evidence in the record, which (in the case of responses) actually rebut the fact asserted, and which do not constitute or contain improper legal arguments or conclusions.

#### a.  Precision Pipeline Solutions, LLC

Precision Pipeline Solutions, LLC is a "rapidly-growing leader in the pipeline infrastructure industry.  PPS designs, operates, manages, and builds pipeline systems." Defendants' Amended Statement of Undisputed Facts ("Defs.' SOF") [DE 53] ¶ 9.  PPS also offers electrical equipment installations and meter reading services.  *Id*. ¶ 10.  It is an equal opportunity employer which prohibits discrimination based on any protected category.  PPS maintains an Equal Opportunity Policy in its Employee and Supervisor Handbook

---

Sheet[s] – ERT Installations."  *See* DE 60-1 – 60-10.  The documents do not appear to be authenticated in any way, s*ee* Fed. R. Evid. 901, and Defendants state that a large portion of these "billing sheets" "were not produced by Defendants or created by Defendants." Defendants' Counterstatement of Fact ("Defs.' CSF") [DE 52] at 12.  The Court is unsure what these materials are and declines to consider them in its analysis.  Even if the Court were to consider them, such accounting would have no bearing on the conclusions drawn below.

("Handbook").  *Id.* ¶ 11.  PPS also maintains a Consolidated No-Harassment Policy in the Handbook which prohibits harassment based on race, color, or any other characteristic protected by federal, state, or local laws.  *Id.*  Plaintiff received, read, and reviewed these policies prior to his employment with PPS.  *Id.* ¶ 12.

### b.  PPS Contracts with National Grid

In or about September 2013, National Grid, an electric and gas provider, engaged PPS as an independent contractor for a project ("the Project") which called for PPS to perform two types of services for National Grid's commercial and residential customers:  installing electronic readers on gas meters that would allow for meters to be read remotely, and traditional meter reading services.  *Id.* ¶ 13.  PPS and National Grid have no other contractual arrangement, including with regard to employees being "promoted" or "transferred" from PPS to National Grid.[6]  *Id.* ¶ 14.  While National Grid specified the areas to be serviced, it did not direct PPS on how to provide these services.  Likewise, PPS made all hiring decisions.  *Id.* ¶ 16.

---

[6]  Plaintiff's response to this fact is indicative of many of his responses.  He states

> A) I object on the grounds that this statement is irrelevant. The defendant, Jason Gong (and other members of PPS management) told us that the top 20 producers would be promoted to National Grid. I could not be sure if it was definitely true, because I did not see any written agreement between National Grid and PPS. I only had the word of Jason Gong and other members of PPS management, and until I was informed by the defendant's counsel that there was no agreement, I believed PPS management when they said that there was one.

> B) This is proof that the plaintiff consistently lied to me and other employees at my location.

> C) I was asked by defendant's counsel to answer the questions as best as I can and limit them to the topics he asked (Tr. 74). If he was confused by my response, he should have asked follow up questions.

The Project called for PPS to provide meter installation and reading services to National Grid's customers on Long Island. *Id.* ¶ 17.  Because PPS did not originally have enough staff to serve all of these areas simultaneously, PPS and National Grid agreed that the project would begin with PPS only installing readers in the Riverhead area of Long Island, after which PPS would progressively expand the Project operations from east to west. *Id.* ¶ 18.  PPS informed employees hired for, or transferred to, the Project of its expanding nature, and that Project employees would likely have to provide services in areas west of their initial starting locations because of this expansion. *Id.* ¶ 19.

PPS designated some of its employees "Team Leaders" who were in part responsible for ensuring the production levels of PPS employees. *Id.* ¶ 20.  Team Leaders are responsible for running the "Tailboard," which is a 5-10 minute meeting each morning discussing safety and work-related items.[7] *Id.*  Team Leaders are also responsible for validating all data uploaded by technicians, and for occasionally auditing the performance and production of technicians in a quality assurance type of role. *Id.* ¶ 21.  Team Leaders also perform regular meter reading and/or installation in the field. *Id.* ¶ 22.

---

Plaintiff's Counterstatement of Fact ("Pl.'s CSF") [DE 56] at 2.  Plaintiff's response is deficient in several ways, most notably in that it improperly asserts an argument and provides no citation to the record.  This response and other similarly deficient responses are not considered by the Court.

[7]  Plaintiff's response to the facts asserted in paragraphs 20 and 21 is as follows: "A) I object to this statement on the grounds that it is vague and argumentative.  B) Joe Di'carlo was the only employee that was officially promoted to team leader while we worked out of the Riverhead location, and Randy referred to me and several other technicians as team leaders and gave us extra work (Tr. 47-51)."

22

### c.  PPS Employees are Transferred for the Project

In or about October 2013, PPS completed the Riverhead portion of the Project.  Around this time, approximately 100 Project employees were transferred from Riverhead to PPS's newly established location in Ronkonkoma to provide installation services in the Ronkonkoma area.  *Id*. ¶ 23.  Only five employees remained at the Riverhead location after the transfer and these five were responsible for winding down Project operations.  *Id*. ¶ 24.  Subsequently, on December 9, 2013, fifteen employees were transferred west from Ronkonkoma to PPS's Hicksville location. *Id*. ¶ 25.  Randy Soohoo, together with Kevin Schweiger, determined which employees to transfer based solely on the location of the employees' residence.  Employees who lived further west were transferred to Hicksville in order to minimize changes in employees' commutes.  *Id*. ¶ 26.  Transferred employees were told that, if requested, they would be transferred back to Ronkonkoma when PPS hired more personnel for the Hicksville portion of the Project.  *Id*. ¶ 27.

### d.  Meter Installers and Meter Readers

Employees performing installation of meters in the Ronkonkoma area ("Installers") and employees reading meters in the Hicksville area ("Readers") received the same wages, worked the same hours, and shared other similarities.  *Id*. ¶ 28.  Both are paid $14.00/hour after completing an introductory period, and both utilize company-issued vehicles to perform their duties.  *Id*. ¶¶ 35-36.  Employees are expected to keep these vehicles tidy and are provided access to garbage bins and industrial vacuums for this purpose. *Id*. ¶ 36.  Employees are not required to pay to clean or wash these vehicles.  *Id*. ¶ 36.

Installer and Reader routes cover certain geographic areas served by their respective sites and are assigned at random.  An Installer or Reader is required to complete his or her entire

assigned route before being assigned another route.  *Id.* ¶ 29.  Once an employee completes his or her route, he or she is transferred to another available route.  Readers, unlike Installers, will likely be assigned to the same route more than once.  *Id.* ¶ 30.  PPS occasionally assigns employees to "clean up routes" comprised of locations originally missed when an installation or read was attempted, and these routes can be slightly more challenging.  *Id.* ¶ 31.  Even these routes are assigned at random, and there are no negative consequences if an employee's install/read rate is lower when completing a cleanup route.  *Id.*

Both Installers and Readers are expected to meet certain performance goals, with Installers expected to install 25-30 gauges per day, and Readers expected to read 100-200 meters per day depending on the area assigned.  *Id.* ¶¶ 32-33.  If an employee's performance consistently and without explanation falls below these goals, they are subject to progressive discipline, up to and including termination.  *Id.* ¶ 34.

### e.  Plaintiff's Employment with PPS

Plaintiff was hired as an Installer based out of the Riverhead location on or about August 5, 2013 after being interviewed by Randy Soohoo and Human Resources Director Erin Livesey. *Id.* ¶ 37.  Plaintiff was informed that he may be transferred to one of PPS's more western locations as the Project continued to expand.  *Id.*  Plaintiff was an excellent performer in Riverhead.  *Id.* ¶ 38.  In or around October 2013, Plaintiff was one of approximately 100 Project employees transferred from Riverhead to PPS's newly established location in Ronkonkoma.  *Id.* ¶ 39.  Only about five employees remained in Riverhead to wind down the Project there.  *Id.* ¶ 40.

On December 9, 2013, Soohoo transferred Plaintiff and fourteen other employees from Ronkonkoma to Hicksville to work as Readers -- a decision based solely on the geographic location of employees' homes -- and Plaintiff lived farther west than most other employees. *Id*. ¶ 41. Plaintiff continued to be an excellent performer, such that occasionally Soohoo would ask him to pick up the slack for other technicians who were not performing as efficiently. *Id*. ¶ 42. After transferring to Hicksville, Plaintiff informed Soohoo and Hicksville Supervisor Jason Gong that he preferred working out of Ronkonkoma to working out of Hicksville. *Id*. ¶ 44. Plaintiff was assured that he would be transferred back as soon as PPS could hire more employees to work out of the Hicksville location. *Id*. Plaintiff never suggested there was any urgency to his transfer request, nor did he suggest that he wished only to do meter reading in Ronkonkoma.[8] *Id*.

Between December 2013 and March 2014, PPS hired and trained additional personnel to work as Readers out of its Hicksville location. On April 1, 2014, PPS transferred Plaintiff and four other employees back to their Ronkonkoma Installer positions. *Id*. ¶ 45. An employee named Brittany was transferred from Hicksville to Ronkonkoma one month before Plaintiff since she was a more productive Reader than Plaintiff. *Id*. ¶ 46. Another employee, Eli Guevara was transferred from Ronkonkoma to Hicksville; his position was not "filled" because of the consistent flow of PPS employees to Ronkonkoma. *Id*. ¶ 47. Other employees who were transferred with Plaintiff to Hicksville on December 9, 2013, requested transfers back to Ronkonkoma, but were transferred after Plaintiff or not at all. *Id*. ¶ 48.

---

[8]  Plaintiff's response to this paragraph asserts that he had mentioned to his supervisors "over the course of four or five months . . . that [he was] worried about [his] sick father suffering a heart attack." Pl.'s CSF at 7. However, like so many other parts of Plaintiff's Rule 56.1 Counterstatement, this response does not refer to any factual support in the underlying record.

On or about April 2, 2014, Plaintiff informed Soohoo that he had been having headaches and requested time off to recover. *Id*. ¶ 49. Soohoo told Plaintiff to take as much time as he needed, although when he returned, he would need to provide a doctor's note, as it was company policy. *Id*. ¶ 50. When Plaintiff informed Soohoo that he was capable of working, Soohoo promptly returned Plaintiff to the schedule without any penalty or questioning. *Id*. ¶ 51.

On May 12, 2014, Plaintiff voluntarily resigned because, according to his Voluntary Resignation form, he "[did] not like the job anymore." *Id*. ¶ 52. Plaintiff did not complain that his transfers, route assignments, or any other job action were motivated by discriminatory reasons at any time during his employment or resignation. *Id.* Plaintiff did not receive any performance counseling during his employment with PPS; he was never suspended; he never had his hourly salary reduced; and he was never required to clean his own truck at his own expense. *Id*. ¶ 54.[9]

### 2. *Undisputed Facts as Asserted by Plaintiff*

The following facts are drawn from Plaintiff's Rule 56.1 Statement [DE 48]. The Court references the Rule 56.1 Statement rather than the underlying record and the facts asserted are undisputed unless otherwise noted. At the outset, the Court observes that the facts presented in Plaintiff's Rule 56.1 Statement do not set out a coherent narrative, and it is difficult to see how many of those "facts" are relevant, let alone material, to Plaintiff's claims. Any comprehension that does exist is greatly diminished when Plaintiff's unsupported or otherwise improper assertions removed from consideration. Indeed, there are only a handful of facts asserted as

---

[9] Paragraphs 55-127 of Defendants' Rule 56.1 Statement are in many ways duplicative of the facts already asserted, and also appear to be tailored to rebutting the allegations Plaintiff has made during the course of this litigation. The Court will not recount those facts here.

undisputed in Plaintiff's Rule 56.1 Statement that are properly supported by citations to admissible evidence in the record.  These are recounted below.

Randy Soohoo could not recall the number of employees written up for being late from December 2, 2013 through April 1, 2014.[10]  Plaintiff's Amended Statement of Undisputed Facts ("Pl.'s Am. SOF") [DE 48] ¶ 2.  Randy Soohoo could not recall when he learned of Plaintiff's request to be transferred back to Ronkonkoma.  *Id.* ¶ 3.  Soohoo supervised Ellis Brown who was frequently absent and late to work,  Ellis Brown was eventually terminated due to an at-fault vehicle accident.  *Id.* ¶ 4.  Plaintiff missed a "test" date and started work on (presumably September) 13, 2013.  *Id.* ¶ 10.  When Plaintiff was transferred to Hicksville, he was the only African-American at the location, an employee named Heather was the only woman at the location, and an employee named Sergio was the only Hispanic at the location.  *Id.* ¶ 18.  Similarly, when Plaintiff was transferred back to Ronkonkoma, he was the only African-American installer at that location.[11]  *Id.*

In October 2013, while Plaintiff was at the Riverhead location, PPS promoted an employee named Joey Di'Carlo.  *Id.* ¶ 22.  Joey Di'Carlo's starting pay with PPS was $12/hour, while Plaintiff and other employees started at a rate of $13/hour.  *Id.* ¶ 30.  According to Joey Di'Carlo, PPS is diverse and everyone is treated fairly.  *Id.* ¶ 31.  Plaintiff and Joey worked together on April 17, 2014, performing all installations on that date together.  *Id.* ¶ 36.

---

[10]   In their response, Defendants clarify that the complete response was "PPS' policy with respect to lateness depended on providing advance notice, and the frequency of lateness. Typically an employee would be written up if he or she was late more than three times a month. I do not recall how many employees were written up for lateness."  Defs.' CSF at 2.

[11]   In his Complaint Plaintiff alleges that when he was transferred back to Ronkonkoma he was one of two African-American meter installers.  *See* Compl. at 13.

The handbook Plaintiff was given when he was hired by PPS did not state anything about deductions from an employee's paycheck for traffic violations. *Id.* ¶ 26. Defendants were aware of and have acknowledged deductions from employees' paychecks for certain traffic violations. *Id.* ¶ 29.

In or around January 2014, Plaintiff "passed all of [his] reviews" and he scored 100 out of 100 on a written meter reading test that was administered in February or March 2014. *Id.* ¶ 39. Plaintiff requested certain documents from PPS, and pursuant to that request he received "daily billing sheets" for the week of October 21, 2013; however certain dates were missing. *Id.* ¶ 40. Plaintiff worked with an employee named "Winston" on Friday April 18, 2014. *Id.* ¶ 44.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)). Likewise, a fact is material when it "might affect the outcome of the suit under the governing law." *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Ultimately "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)); *see Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715

F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09 Civ. 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor.").  Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

Thus, a court's primary concern when analyzing a motion for summary judgment is to "ascertain whether there are any 'genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cohen v. Uitca First Ins. Co.*, 436 F. Supp. 2d 517, 527 (E.D.N.Y. 2006) (quoting *Anderson*, 477 U.S. at 250, 106 S. Ct. 2505). In dispatching this task, the Court need only consider "admissible evidence." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2008)); *Lopez v. Connecticut Basement Sys., Inc.*, No. 3:12-cv-01211, 2015 WL 4601014, at *5 (D. Conn. July 29, 2015); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 251 (E.D.N.Y. 2014). Further, a district court "has broad discretion in choosing whether to admit evidence." *Porter*, 722 F. 3d at 97 (quoting *Presbyterian Church of Sudan*, 582 F.3d at 264; *see Nora Beverages*, 164 F.3d at 746 (citing *Raskin v. Wyatt*, 125 F. 3d 55, 66 (2d Cir. 1997)).

Importantly, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'" *Giarratano v. Edison Hotel*, No. 08 CIV. 1849, 2009 WL 464441, at *4 (S.D.N.Y. Feb. 24, 2009) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). Indeed, "[c]ourts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where ... plaintiff has offered little or no evidence of discrimination." *Giarratano*, 2009 WL 464441 at *4 (quoting *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. CIV.3:02-CV-1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004)).

The Court is cognizant that *pro se* filings such as Plaintiff's motion for summary judgment and his opposition to Defendants' motion for summary judgment are to be liberally

30

construed.  *Shin v. Queens Hosp. Ctr. in Jamaica*, No. 14-CV-7237, 2014 WL 7422664, at *3 (E.D.N.Y. Dec. 31, 2014).  As such, the Court interprets Plaintiff's motion and opposition "to raise the strongest arguments that they suggest."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 878, 890 (2d Cir.1994)).

## IV.   DISCUSSION

Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., alleging that because of Plaintiff's race, Defendants failed to promote him, created unequal terms and conditions of employment for him, retaliated against him, and maintained a racial quota system.  *See* Compl. at 3.  Courts analyze Title VII discrimination claims under the three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014);  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions."  *Abrams*, 764 F.3d at 251.  "Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff."  *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446 (2d Cir. 1999) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507).  That is to say, if a defendant proffers a legitimate non-discriminatory reason for its actions, the presumption of discrimination created by plaintiff's *prima facia* case disappears, at which point a

plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision, and that race was." *Bickerstaff*, 196 F.3d at 446 (internal quotation marks omitted).

### A.   Title VII Discrimination Claim

#### 1.   *Plaintiff's* Prima Facie Case

Title VII of the Civil Rights Act provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

For a plaintiff alleging violations of Title VII to meet her *prima facie* burden, she must establish that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  While the Court accepts that Plaintiff satisfies the first two factors of the *McDonnell Douglas* test,[12] the undisputed facts as asserted by the parties do not support an inference, let alone establish by a preponderance of

---

[12]   Nor do Defendants dispute this.  *See* Defendants' Memorandum of Law ("Defs.' Mem.") [DE 60] at 6.

the evidence, that Plaintiff has suffered an adverse employment action, or that the circumstances give rise to an inference of discrimination.

### a. Adverse Employment Action

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Pfizenmayer v. Hicksville Pub. Sch.*, No. 15-CV-6987, 2017 WL 5468319, at \*7 (E.D.N.Y. Jan. 24, 2017) (quoting *Kassner*, 496 F.3d at 238). To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Pfizenmayer*, 2017 WL 546839, at \*7 (quoting *Kassner*, 496 F.3d at 238). "Employment actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an 'adverse employment action' include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 422 (E.D.N.Y. 2014) (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

### i. *Plaintiff's Transfer to Hicksville*

The only action mentioned in Plaintiff's Rule 56.1 Statement and accepted by the Court for consideration which might even subjectively be considered adverse was Plaintiff's transfer to Hicksville. *See* Pl.'s Am. SOF ¶ 18. That transfer, however, does not constitute an adverse employment action under Second Circuit case law. "Where the allegedly adverse action is an involuntary transfer, 'the key inquiry . . . is whether the transfer constitutes a negative employment action tantamount to a demotion.'" *Forsythe v. New York City Dep't of Citywide*

*Admin. Servs.*, 733 F. Supp. 2d 392, 400 (S.D.N.Y. 2010), *aff'd*, 428 Fed. App'x 40 (2d Cir. 2011) (quoting *Pacheco v. N.Y. Presbyterian Hosp.,* 593 F. Supp. 2d 599, 617 (S.D.N.Y.2009)). PPS informed its employees working on the Project that they would likely be transferred west as the Project progressed. *See* Defs.' SOF ¶ 19. No evidence has been presented by the Plaintiff to show that this transfer was anything other than part and parcel of the Project's progression. *Id.* ¶¶ 18-19. This type of change, to the extent it is adverse at all, constitutes only a "mere inconvenience" and is not akin to termination, demotion, a material loss of benefits, or other circumstances which courts in this Circuit have recognized as "materially adverse." *See Onofre Polanco v. 34th St. P'ship, Inc.*, 724 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) (finding that employer's reassignment of a street cleaning route did not constitute an adverse employment action, and although plaintiff "may not have been as satisfied with his new route as with his old one, [ ] 'not every unpleasant matter short of discharge or demotion constitutes an adverse action under Title VII'") (quoting *Delgado v. Triborough Bridge and Tunnel Auth.,* 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007)); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 256 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) ("Mere undesirable classroom assignments generally do not rise to the level of an adverse employment action. . . . An unattractive room in which to teach is not actionable.") (citations omitted); *Forsyth*, 733 F. Supp. 2d at 400 ("Generally, a change in shift time or location that is merely inconvenient does not rise to the level of an adverse employment action.").

Moreover, the fact that Plaintiff did not want to be transferred to Hicksville, or considered it to be disadvantageous, is not determinative. Without more, this factor alone does not support the conclusion that Plaintiff's transfer was "materially adverse." *See Williams v.*

34

*R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.") (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532-33 n. 6 (10th Cir. 1998)); *Johnson v. Eastchester Union Free Sch. Dist.*, 211 F.Supp.2d 514, 518 (S.D.N.Y. 2002) ("Johnson identifies his new hours and job location to be very inconvenient for him.  Inconvenience by itself, however, does not constitute an adverse job action.").

### ii.  *Plaintiff's Return to Ronkonkoma*

Plaintiff's other main contention, although not explicitly stated in his Rule 56.1 Statement, is that because of his race, he was not transferred back to Ronkonkoma sooner and/or in his desired position as a meter reader (rather than installer).  *See* Pl.'s Am. SOF ¶¶ 3, 18; Pl.'s CSF at 7-8; Compl. at 9-10.  Neither Plaintiff's inability to return to Ronkonkoma more quickly, nor his inability to return as a meter reader rather than a meter installer, constitutes an adverse employment action.  Like his involuntary transfer from Ronkonkoma to Hicksville, the transfer Plaintiff sought from Hicksville back to Ronkonkoma, both in terms of location and job title (reader vs. installer), was effectively lateral in nature.  *See* Defs.' SOF ¶¶ 28, 35-36.  The denial or delay in granting such a request does not "materially disadvantage" an employee.  *See Wilson v. New York City Dep't of Transp.*, No. 01 CIV. 7398, 2005 WL 2385866, at *17 (S.D.N.Y. Sept. 28, 2005) ("[P]laintiff does not allege that he lost wages, retirement credits, or other benefits as a result of the denial. Rather, at best, the record indicates that plaintiff sought an 'alteration of job responsibilities' by applying for a transfer, not material changes to the terms of his employment,

such as a raise or promotion. In other words, plaintiff was applying for a lateral transfer. As a general matter, lateral transfers are typically insufficient to give rise to an adverse employment action."); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("[T]here is no evidence that shows that the delay in reassignment . . . was an adverse employment action. Appellant does not allege that appellee denied him an available transfer, that appellee failed to pay his salary during the interim period, or that the delay in any way harmed his career. The unspecified inconvenience that appellant endured because of the relatively minor administrative miscues that occurred during the reassignment process is not cognizable as an adverse employment action.").

### iii.   Other alleged conduct[13]

Although it does not appear in his Rule 56.1 Statement of Undisputed Fact, and although his motion papers do not clearly flesh out the point, to the extent Plaintiff claims that other conduct by Defendants constituted adverse employment action, there is nothing in the record to support this claim. With respect to the way Plaintiff was treated in Hicksville and the assignments he was given, there is no indication that he suffered any adverse employment action. "While an increased workload is considered only a mere alteration of job responsibilities, a workload heavily disproportionate to those similarly situated has been held to be an example of

---

[13]   Defendants raise an argument that there is no evidence in the record to support the allegation that Plaintiff was "constructively discharged." This appears in this section of their memorandum of law addressing whether Plaintiff has established that he suffered an adverse employment action. *See* Defs.' Mem. at 14-15. The Court notes that while Plaintiff alleged constructive discharge in his administrative complaint to NYSDHR, *see* Compl. at 22 (indicating next to the "other" box that Plaintiff was "forced to resign"), he did not so allege in the Complaint which commenced this action. *See* Compl. at 3 (indicating next to the "other" box "Had a quota system"). As such, the Court declines to address a potential constructive discharge claim.

an adverse action." *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) (citing *Feingold v. New York,* 366 F.3d 138, 153 (2d Cir. 2004)).  There is no evidence in the record that Plaintiff had a "workload heavily disproportionate to those similarly situated."

To the extent Plaintiff alleges that one of his supervisors, John Parente, discriminated against him by asking him to wash his company car or pay to have it washed, and that the request constituted an adverse employment action, *see* Compl. at 12, the claim is without merit.  Indeed, Plaintiff never actually washed his company car nor paid to have it washed, *see* Defs.' SOF ¶¶ 54, 113 -- and Plaintiff was told immediately after his conversation with Parente that PPS was "absolutely not" asking Plaintiff to wash the company car.  *Id*. ¶ 112.  These and other alleged incidents of which Plaintiff complains appear to be examples of general interpersonal conflict in the workplace.  "[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (citation omitted); *see Martinez v. New York City Dep't of Educ.*, No. 04 CIV. 2728, 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) ("[I]ncidents where [a supervisor] publicly yelled at Plaintiff for various reasons or called him 'shit' . . . constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable.").

Nor can Plaintiff claim that PPS's policy requiring employees to return from sick leave with a doctor's note was, when applied to Plaintiff, an adverse employment action.  *See* Defs.' SOF ¶¶ 121-24.  The law is well settled that "requiring [a] Plaintiff to supply medical documentation for sick leave is not an adverse employment action where Plaintiff has not alleged

that he was prevented from using his sick leave or that his terms of employment were altered because of the documentation requirement." *Cotterell*, 64 F. Supp. 3d at 429 (quoting *Sethi v. Narod,* 12 F. Supp. 3d 505, 530 (E.D.N.Y.2014)); *see Blake v. Potter,* No. 03–CV–7733, 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) ("[N]o reasonable fact-finder could conclude that Plaintiff was subject to 'adverse employment actions' as a result of being asked to provide a doctor's note in connection with a request for sick leave. . . . [C]ourts in this District have held that an employer's request for documentation in connection with medical leave does not constitute such an 'adverse employment action.'") (citation omitted), *aff'd,* 330 Fed. App'x. 232 (2d Cir. 2009).

In sum, Plaintiff has failed to point to any evidence in the record to establish that he suffered an adverse employment action at the hands of Defendants.  Because of this, Plaintiff is unable to make out a *prima facie* case of discrimination under Title VII.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).  However, to fully evaluate the motions at hand, the Court will continue its analysis and address the parties' remaining arguments.

### b.  Inference of Discrimination

Assuming for the sake of argument that Plaintiff was able to establish he suffered an adverse employment action, he would still need to establish that the circumstances give rise to an inference of discrimination in order to make out a *prima facie* Title VII claim.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d at 83.  "A plaintiff can show circumstances giving

38

rise to an inference of discrimination in a variety of ways, including by relying on the theory of disparate treatment; that is, by showing that [his] employer treated [him] less favorably than a similarly situated employee outside [his] protected group." *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014). "[A]n inference of discrimination may [also] be drawn from a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably." *Beverley v. 1115 Health & Benefits Fund*, 420 F. Supp. 2d 47, 59 (E.D.N.Y. 2005)

In the Court's view, the undisputed facts in the record do not permit an inference of discrimination. *See Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *11 (E.D.N.Y. May 24, 2010). The only fact asserted by Plaintiff in his Rule 56.1 Statement of Undisputed Fact that could potentially be viewed as supporting an inference of discrimination is Plaintiff's claim -- which Defendants do not attempt to dispute, --, that when Plaintiff was transferred to Hicksville, he was the only African-American at the location, and similarly that when he was transferred back to Ronkonkoma, he was the only African-American installer at that location at that time.[14]  Pl.'s Am. SOF ¶ 18; *see* Defs.' CSF at 6. In the absence of any other evidence of discrimination, these assertions are insufficient to raise an inference of discrimination based on Plaintiff's race. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 105

---

[14]  Plaintiff appears to assert this fact to support an inference that PPS had a racial quota system at different locations. Yet the fact that Plaintiff himself requested and received the transfer to Ronkonkoma, resulting in his becoming the only African-American installer at that location, seems irreconcilable with the allegation that PPS moved Plaintiff to Ronkonkoma in order to fill a quota. As noted previously in footnote 16, *supra*, this allegation is at odds with the statement in Plaintiff's Complaint that he was one of two African-American meter installers when he returned to Ronkonkoma.

(S.D.N.Y. 2012) ("The fact that Risco was the only Hispanic, dark-skinned employee in the Education Center during the ten months of her employment, and her unsupported assertion that Byrd would have treated her differently if she had been a light-skinned Caucasian, [ ] does not supply sufficient evidence to establish a *prima facie* case of discrimination."); *Anderson v. Hertz Corp.,* 507 F. Supp. 2d 320, 329 (S.D.N.Y.2007) (finding insufficient evidence for *prima facie* case where plaintiff was the only African–American at a particular site supervised by his superior for a twelve-year period), *aff'd,* 303 Fed. App'x. 946 (2d Cir. 2008); *see Padob v. Entex Info. Serv.,* 960 F. Supp. 806, 813 (S.D.N.Y. 1997) (finding plaintiff's conclusory assertion that she was subjected to differential treatment because she was a woman did not create a genuine issue of material fact as to discrimination).

Expanding the scope of the Court's inquiry beyond the facts asserted in Plaintiff's Rule 56.1 Statement, the record does not contain sufficient facts to support an inference of discrimination, either through evidence of overt discrimination, of which there is none, or through evidence of disparate treatment. The Court finds no evidence in the record that PPS treated Plaintiff less favorably than others similarly situated. Indeed, Plaintiff's deposition testimony appears to preclude such a finding, as Plaintiff's admissions indicate he lacks the knowledge to be able to allege, let alone prove, that PPS's team leaders were "similarly situated" to Plaintiff. *See* Defs.' SOF ¶¶ 87-88, 98-108. *See Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) ("If a comparison with another employee is to lead to an inference of discrimination it is necessary that the employee be similarly situated in all material respects.") Moreover, the fact that PPS employed other African-Americans as team leaders cuts against an inference of discrimination. *See* Defs.' SOF ¶ 98.

After examining the record in detail, the Court concludes that even if Plaintiff had been able to establish that he suffered an adverse employment action, he is unable to establish that his circumstances at PPS support an inference that he suffered discrimination based on his race. For this additional reason, summary judgment is appropriate.

### 2. *Legitimate Non-Discriminatory Reasons for Defendants' Actions*

If Plaintiff were able to establish a *prima facie* case of discrimination, the presumption of discrimination would be created, and the burden would switch to Defendants to rebut that presumption by proffering legitimate, non-discriminatory reasons for their actions. *See Abrams*, 764 F.3d at 251. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S. Ct. 1089, 1094–95, 67 L. Ed. 2d 207 (1981). Notwithstanding Plaintiff's inability to establish his *prima facie* discrimination case for the foregoing reasons, the Defendants have met what would be their burden at this point in the *McDonnell Douglas* inquiry by pointing to undisputed facts supported by admissible evidence in the record to articulate legitimate, non-discriminatory reasons for the acts of which Plaintiff complains. *See St. Mary's Honor Ctr.*, 509 U.S. 528-29 ("The Court in *McDonnell Douglas* reconciled [ ] competing interests in a very sensible way by requiring the employer to 'articulate,' through the introduction of admissible evidence, one or more 'legitimate, nondiscriminatory reason[s]' for its actions. . . . The Court emphasizes that the employer's obligation at this stage is only a burden of production, and that, if the employer meets the burden, the presumption entitling the plaintiff to judgment "drops from the case.") (internal citations omitted).

41

As Defendants point out, the record contains undisputed evidence supporting PPS's claim that:  the Project work was progressing naturally from east to west, *see* Defs.' SOF ¶¶ 17-19; PPS transferred Project employees to locations based solely on the proximity to their residences, *see id.* ¶ 41; there was only one employee transferred back to Ronkonkoma before Plaintiff, and she was a more productive meter reader, *see id.* ¶ 46; some employees who requested transfers back to Ronkonkoma were transferred after Plaintiff or not at all, *see id.* ¶ 48; and that PPS's enforcement of its doctor's note policy was consistent with how it treated other employees who requested sick leave.  *See id.* ¶ 50.  *See also* Defs.' Mem. at 17-18.  These undisputed facts and the record evidence on which they are founded further support the Court's conclusion that summary judgment in favor of Defendants is appropriate in this case.

### B.  Hostile Work Environment Claim

To the extent Plaintiff raises a Title VII hostile work environment claim, the Court does not find any evidence in the record to create a genuine issue of material fact as to Plaintiff's claim.  To succeed on a claim for hostile work environment under Title VII, Plaintiff needs to able to prove that the conduct he encountered "(1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race]."  *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 425 (E.D.N.Y. 2012) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting a hostile work environment claim requires a showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult .

42

. . that is sufficiently severe or pervasive to alter the conditions of the [individual's] employment and create an abusive working environment") (internal citations omitted).

In order to determine whether the conduct alleged is sufficiently severe or pervasive, courts look to the following non-exhaustive list of factors: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Sotomayor*, 862 F. Supp. 2d at 260-61 (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009)) (internal quotations and citation omitted); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693-94 (2d Cir. 2012); *Acosta v. City of New York*, No. 11 Civ. 856, 2012 WL 1506954, at *7 (S.D.N.Y. Apr. 26, 2012). "Periodic and episodic incidents are not sufficient to establish hostile work environment claims." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 203, 234 (E.D.N.Y. 2014); *see Cruz v. Coach Stores*, 202 F.3d 560, 570 (2d Cir. 2000) ("Isolated instances of harassment ordinarily do not rise to this level."); *Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. App'x 186, 189-90 (2d Cir. 2010) ("Generally, unless an incident of harassment is sufficiently severe, [the] 'incidents [comprising a hostile work environment claim] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'") (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 313 (E.D.N.Y. 2014) (recognizing that "single incidents of harassment generally do not create a hostile work environment"). Likewise, "[s]everity is a hallmark of a hostile work environment claim. Such claims 'are not intended to promote or enforce civility, gentility or even decency.'" *Acosta*, 2012 WL 1506954, at *7

43

(quoting *Ennis v. Sonitrol Mgmt. Corp.*, No. 02–CV–9070, 2006 WL 177173, at *9 (S.D.N.Y. Jan. 25, 2006)).  Further, "to succeed on a hostile work environment claim against an employer, the plaintiff must show that 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'"  *Benedith*, 38 F. Supp. 3d at 313 (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004)); *Boza–Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 547 (W.D.N.Y. 2016).

Given the evidence in the record, Plaintiff is unable to satisfy any of the five non-exhaustive factors which courts examine to determine if conduct is sufficiently severe or pervasive – frequency and severity, whether conduct is physically threatening, whether it interferes with Plaintiff's work or whether it resulted in psychological harm.  *See Sotomayor*, 862 F. Supp. 2d at 260-61.  As the Court has already noted, to the extent there existed any actions by PPS or the individual Defendants which could be construed as negative or "adverse," it appears such actions sprung from somewhat ordinary interpersonal workplace interactions. "[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable."  *Tepperwien*, 663 F.3d at 571.  Even if Plaintiff had been subjected to isolated off-color remarks with racial undertones, "[t]he United States Supreme Court has held that occasional off-color or inappropriate remarks with racial or sexual undertones do not alone create a hostile work environment under Title VII."  *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 363 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271-72, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).  In the absence of *any* overtly hostile comments or actions by any of the Defendants and the lack of any other evidence of hostile conduct, the Court concludes that Plaintiff is, as a matter of law, unable to establish

44

that the Defendants' conduct was either objectively severe or pervasive, or the result of Plaintiff's race.  Plaintiff is therefore unable to succeed on his hostile work environment claim.

### D.  Retaliation Claim

Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim, because he did not make any reference to retaliation in his administrative complaint with the NYSDHR.  *See* Defs.' Mem. at 20-21.  Without addressing this issue, the Court concludes that Plaintiff's retaliation claim must fail as a matter of law since there is no evidence in the record to support a *prima facie* case of retaliation.   First, Plaintiff's deposition testimony and other record evidence preclude a finding that Plaintiff engaged in a "protected activity."   Second, Plaintiff never suffered an "adverse employment action."

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).  An employee's actions may qualify as "protected activity" where the employee has a good faith, reasonable belief that he or she is complaining about or challenging an employment practice made lawful by Title VII.  *Kelly*, 716 F.3d at 14 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)).

Plaintiff testified at his deposition that when he filed his complaint with human resources based on his being asked to wash the company car and based on PPS's perceived failure to transfer him back to Ronkonkoma in a timely manner, he "didn't state, oh, it was because I was

black, why he did what he did.  And then I guess – right, that would make it – she would be obligated by law to hear my complaint, if I stated that. But I didn't say that."  Defs.' SOF ¶ 126. The Court finds that Plaintiff could not have possessed a reasonable, good faith belief that he was engaged in a protected activity where he never raised a complaint or challenged an employment action as being related to his race or ethnicity, or any other statutorily prohibited form of discrimination.  *See Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 309 (S.D.N.Y. 2009) (finding that where plaintiff "could not remember whether she specifically articulated a concern about race discrimination," and other complaints were standard employment complaints unrelated to statutorily prohibited discrimination, plaintiff failed to establish a prima facie retaliation claim, and "[w]hile plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity"); *see also Kelly*, 716 F.3d at 14-16 (citing cases).

Additionally, Plaintiff fails to make out a *prima facie* retaliation claim because, as discussed previously at length, he cannot establish that he suffered an "adverse employment action."  Put simply, neither Plaintiff's transfer to Hicksville, his inability to be quickly transferred back to Ronkonkoma, his transfer back to Ronkonkoma as a meter installer rather than meter reader, nor any other action he can point to in the record, constitutes a "materially adverse" change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities."[15]  *Pfizenmayer*, 2017 WL 546839, at *7.

---

[15]  The Court notes that "adverse employment action" in the retaliation context includes "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington Northern & Santa Fe Railway. Co. v. White*, 548 U.S. 53, 57 (2006)); *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 491 (E.D.N.Y. 2016) (quoting *Feliciano v. City of New York*, No. 14 Civ. 6751, 2015 WL 4393163, at *9 (S.D.N.Y. July 15, 2015)) (alteration in original).  "This definition covers a broader range

Because Plaintiff is unable to establish a *prima facie* retaliation claim, the Court respectfully recommends to Judge Seybert that as to this claim, Plaintiff's motion for summary judgment be denied, and Defendants motion for summary judgment be granted.

### E. Failure to Promote Claim[16]

In the narrative incorporated into his Complaint, Plaintiff appears to allege he was unfairly or improperly denied a promotion to a "team leader" position.  *See* Compl. at 8.  Further, one of Plaintiff's documents included in his summary judgment papers is titled "Motion for Summary Judgment: Less Qualified Employees that were Promoted Ahead of Me."  *See* DE 61 at 13-15.  The Court will therefore briefly address Plaintiff's claim that PPS failed to promote him in violation of Title VII.

Under Title VII, a plaintiff claiming discriminatory failure to promote must establish that, in addition to being a member of a protected class, he/she was qualified for a position, applied for that position, and was denied the position under circumstances which give rise to an inference of discrimination on a basis forbidden by Title VII.  *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).  There is no evidence in the record that Plaintiff applied for a position as a team leader.  He is therefore unable to make out a *prima facie* case of discriminatory failure to promote as a matter of law.  .

---

of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega*, 810 F.3d at 90 (citing *Burlington Northern & Santa Fe Railway Co.*, 548 U.S. at 57). However even under this standard, nothing in the record supports an inference, let alone is able to establish, that Plaintiff suffered an "adverse employment action" sufficient to dissuade a reasonable employee from making or supporting a charge of discrimination.

[16]   The Court notes that Defendants address this potential claim in their argument regarding adverse employment action under Title VII discrimination claims.

### F.  Plaintiff's Discovery Dispute

Plaintiff also attempts to insert into his motion for summary judgment several discovery disputes.  *See* DE 61 at 16-20 ("Motion for Summary Judgment: Missing and/or Conflicting Information Submitted by Defendant").  Plaintiff appears to complain about documents he states he never received that this Court directed Defendants to provide.  *See id.*  This Court declines to address Plaintiff's discovery disputes when raised in his motion for summary judgment for the first time, since Plaintiff has failed to indicate how the information sought would create a genuine issue of material fact where none otherwise exists.  *See Alzawahra v. Albany Med. Ctr.*, 546 F. App'x 53, 55 (2d Cir. 2013) ("Insofar as Alzawahra invites us to rule on discovery disputes he raised for the first time in his opposition to summary judgment, we decline to do so. Pursuant to Federal Rule of Civil Procedure 56(f), the opponent of a summary judgment motion who seeks additional discovery must file an affidavit explaining (1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful."); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) ("[Even if plaintiffs had obtained what they stated would be uncovered, the information would have been insufficient to defeat summary judgment.").

### V.   CONCLUSION

Based upon the foregoing analysis, the Court respectfully recommends to Judge Seybert that Plaintiff's motion for summary judgment be DENIED and that Defendants' motion for summary judgment be GRANTED.

48

**VI.**    <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* FED. R. CIV. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joanna Seybert, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections**. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


**Defendants' Counsel is directed to serve a copy of this Report and Recommendation upon the *pro se* Plaintiff forthwith by overnight mail and first-class mail, and to file proof of such service on ECF**.


                                                    **SO ORDERED**.

Dated: Central Islip, New York
       February 26, 2018

                                                    /s/ A. Kathleen Tomlinson
                                                    A. KATHLEEN TOMLINSON
                                                    U.S. Magistrate Judge